**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KIMBERLY FLANAGAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 11-cv-8849 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| COOK COUNTY ADULT PROBATION | ) | |
| DEPARTMENT, OFFICE OF THE CHIEF | ) | |
| JUDGE OF THE CIRCUIT COURT OF | ) | |
| COOK COUNTY, ILLINOIS; DONNA | ) | |
| VAUGHAN; and PHIL LOIZON | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

Plaintiff Kimberly Flanagan ("Flanagan") brings this suit against her employer, Cook

Count Adult Probation Department ("APD"), an agency administered through the Office of the

Chief Judge of the Circuit Court of Illinois ("OCJ") (entity collectively referred to as

"Defendant"), alleging racial discrimination and retaliation in violation of 42 U.S.C. § 2000 et.

seq. ("Title VII") and 42 U.S.C. § 1981 ("1981") based on a panoply of incidents that occurred

between March 2008 and May 2012.[1]  Before the court is Defendant's Motion for Summary

Judgment pursuant to Federal Rule of Civil Procedure 56(c) ("motion").  For the reasons

discussed in detail below, Defendant's motion is granted.

### I.    BACKGROUND

Local Rule 56.1(a)(3) requires a party moving for summary judgment to submit "a

statement of material facts as to which the moving party contends there is no genuine issue and

---

[1] Flanagan also named co-workers Donna Vaughan and Phil Loizon as defendants in her second amended complaint pursuant to § 1981.  In her response to Defendants' motion for summary judgment, Flanagan conceded that § 1981 does not create a private right of action against state actors.  *Campbell v. Forest Preserve Dist. Of Cook County*, 752 F.3d 665, 666 (7th Cir. 2014).

that entitle the moving party to judgment as a matter of law." *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (citing L.R. 56.1(a)(3)).  Under Local Rule 56.1(b)(3), the nonmoving party then must submit a "concise response" to each statement of fact, "including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon."  L.R. 56.1(b)(3)(B).  The nonmoving party may also present a separate statement of additional facts "consisting of short numbered paragraphs," with citations to the record, that require the denial of summary judgment.  *See* L.R. 56.1 (b)(3)(C); *see also Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008).

Defendant filed a motion to strike and deem admitted portions of Flanagan's response to its statement of facts and to strike portions of Flanagan's statement of additional facts.  [Mot. to Strike, ECF No. 129.]  The motion mostly rehashes the arguments made by Defendant in its response to Flanagan's statement of additional facts.  Moreover, the court is capable of determining which facts are relevant to the present motion and disregarding extraneous or improper factual statements.  *Hanover Ins. Co. v. Northern Building. Co.*, 891 F.Supp.2d 1019, 1025 (N.D. Ill. 2012).  Defendant's motion to strike is therefore unnecessary.  However, some of Flanagan's statements of additional facts and some of her responses to Defendant's statement of facts are so deficient, yet so intertwined with her underlying claims, that they need to be addressed.

As an initial matter, it is improper to characterize undisputed facts as disputed to provide an opportunity to present legal arguments.  *Cardoso v. Cellco P'ship*, No. 13 C 2696, 2014 WL 6705282, at * (N.D. Ill. Nov. 26, 2014).  Likewise, bald denials with no citations to the record in support are ineffective.  L.R. 56.1(b) (the party opposing summary judgment must provide, "in the case of any disagreement [with the movant's facts], specific references to the affidavits, parts

of the record, and other supporting materials relied upon…All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."). Therefore, the court will deem admitted all facts stated by Defendant to the extent that they are supported by the record and improperly denied by Flanagan.[2] As the court notes below, the instances of discrimination and/or retaliation, as alleged in Flanagan's statement of additional facts, are almost too numerous to count. Many are easily dismissed as not being supported by competent evidence.[3] However, one allegation in particular must be addressed as it is of great importance to Flanagan's claims.

Flanagan claims that in March 2008, her co-workers engaged in a "conspiracy to take her life." [Pl. Resp. at 1, ECF No. 121.] According to Flanagan, a former co-worker named Cheryl Anderson ("Anderson") informed Flanagan of a conversation she overheard between Phil Loizon ("Loizon"), a Deputy Chief at APD, and Donna Vaughan ("Vaughan"), the Director of Human Resources at APD. The exact date of this conversation has been a moving target in this litigation. According to Anderson's deposition testimony, the conversation took place in 2006 or 2007. [Def. SOF ¶ 23, Tab D (Anderson), 63:24-64:4, ECF No. 99.] However, Flanagan submitted a document allegedly written by Anderson in May 2008 in which Anderson states that the conversation between Vaughan and Loizon took place on March 11, 2008.[4] According to

---

[2] Of course, what is good for the goose is good for the gander. The court will also deem admitted all facts stated by Flanagan in her statement of additional facts that are supported by the record, competent, and improperly denied by Defendant.

[3] For example, Flanagan's two-sentence allegation that she attempted to get an order of protection against co-worker Phil Loizon but was rebuffed is not supported by admissible evidence. [Pl. SOF ¶ 32, ECF No. 122.] According to Flanagan, a warrant officer named "Mr. Martowski" told Flanagan that he could not assist her in obtaining the protective order because of a phone call that Mr. Martowski received from an unnamed person stating that "it's not going anywhere." Flanagan's allegation lacks proper foundation and cannot defeat the obvious hearsay issues that are presented. Therefore, the allegation has no basis in fact.

[4] It should be noted that in her deposition, Anderson claimed that she memorialized the conversation on the night the conversation took place. [Def. SOF, Tab D (Anderson), 72:19-73:10.] Instead, it is clear that the document was drafted at least two months after the conversation took place.

Anderson, Vaughan told Loizon that she wanted "to bring some bodily harm to Kim Flanagan" and that Loizon responded by saying he "was going to do it." [Def. SOF ¶ 23, ECF No. 99.] After hearing this conversation between Vaughan and Loizon, Anderson testified in her deposition that she alerted Flanagan that she could "be in grave harm" and to "be careful around the workplace." [*Id.* ¶ 24.] Flanagan goes on to describe an elaborate plot by which Vaughan and Loizon would have her murdered by a probationer named Catrina Bonner on March 13, 2008. The court need not detail Flaganan's allegations that she narrowly escaped death by foiling her co-workers' plot. It is undisputed that the sole basis for Flanagan's belief that she was going to be murdered by her co-workers is the "warning" given to her by Anderson. Setting aside the issues concerning the veracity and truthfulness of Anderson's statements due to her inconsistent recollection of the conversation in question, Flanagan cannot overcome the hearsay problems that plague Anderson's statements. There are two levels of hearsay that Flanagan has failed to address. First, Flanagan has failed to explain how the conversation between Loizon and Vaughan fits into any of the exceptions to hearsay. Similarly, Flanagan fails to identify a hearsay exception for Anderson's statements to Flanagan. [5] Therefore, both statements are inadmissible. These hearsay problems prove fatal to Flanagan's claim.

The court will contemporaneously address Defendant's other evidentiary objections throughout the opinion and therefore denies Defendant's motion to strike as moot. Accordingly, the facts recited by the court are taken from the parties' Local Rule 56.1 Statements of Facts

---

[5] Although not argued by Flanagan, the court is aware of the "present sense impression" exception to the hearsay rule. Fed. R. Evid. 803(1). This exception was not raised by Flanagan, and in all likelihood is inapplicable. The court notes that, under Rule 803(1), there are three criteria: "(1) the statement must describe an event or condition without calculated narration; (2) the speaker must have personally perceived the event or condition described; and (3) the statement must have been made while the speaker was perceiving the event or condition, or immediately thereafter." *United States v. Ruiz*, 249 F.3d 643, 646 (7th Cir. 2001). "A declarant who deliberates about what to say or provides statements for a particular reason creates the possibility that the statements are not contemporaneous, and, more likely, are calculated interpretations of events rather than near simultaneous perceptions." *United States v. Woods*, 301 F.3d 556, 562 (7th Cir. 2002). Even if the present sense impression exception applies to Anderson's statement to Flanagan, the first level of hearsay is still unresolved.

("SOFs"), only to the extent that they are supported by admissible evidence and relevant to the issues raised in the motion.

## II.     FACTS

The APD operates under the OCJ and administers a wide range of programs covering both standard and specialized probation supervision and pretrial and presentence services.  At the APD, the chain of command starting from the highest position is as follows: Chief Probation Officer, Assistant Chief Probation Officer, Deputy Chief Probation Officers, Supervisors, and Probation Officers.  Flanagan is a Probation Officer in the APD's Home Confinement Unit, a position she has held since 1999.  The Home Confinement Unit monitors curfews of individuals on probation and pretrial supervision through filed visits, telephone calls, and electronic monitoring.

This is the third lawsuit filed by Flanagan against her employer.  In December 2002, Flanagan filed a complaint against her employer alleging race and sex discrimination.  *Flanagan v. OCJ*, No. 02 C 9190 (N.D. Ill.).  Ultimately, summary judgment was granted in favor of OCJ on the race discrimination claim, leaving the sex discrimination count as Flanagan's only claim. In March 2006, Flanagan filed a second lawsuit against her employer, alleging unlawful retaliation based on the 2002 lawsuit.  *Flanagan v. OCJ*, No. 06 C 1462 (N.D. Ill.).[6]  The two cases were consolidated ("Consolidated Lawsuits").  In January 2007, a jury trial was held, resulting in a verdict for OCJ on Flanagan's sex discrimination claim.  Flanagan, however, prevailed on her retaliation claim and was awarded $205,000 in damages.  OCJ appealed the

---

[6] In addition to OCJ, Flanagan also sued Donna Vaughan, Phil Loizon, Michael Dickerson, and Carolyn Lisle in the 2006 lawsuit.  However, the individual capacity claims against Vaughan, Loizon, Dickerson, and Lisle were dismissed after the 2002 and 2006 cases were consolidated and before trial.

ruling, and, while the appeal was pending, Flanagan settled the Consolidated Lawsuits with OCJ. The settlement agreement was signed on June 5, 2009.

According to Flanagan, a series of unfortunate events, which she describes as discriminatory and retaliatory in nature, unfolded after she succeeded on her retaliation claim against the OCJ in 2007. The instances of discrimination and/or retaliation, as alleged in Flanagan's statement of additional facts, are almost too numerous to count. Included in her complaints of race discrimination are the following:[7] (1) a parking lot confrontation between Flanagan and Loizon in May 2008; (2) Defendant's alleged failure to properly investigate the May 2008 incident; (3) Flanagan's failure to secure the 6 a.m. to 2 p.m. work shift in April 2009; (4) Flanagan's receipt of a red-light ticket in October 2009; (5) Flanagan not being allowed to park in a certain parking lot in May 2010; (6) Defendant allegedly intentionally exposing Flanagan to Hepatitis C in May 2011; (7) Defendant assigning a coach and counselor to Flanagan in December 2011 following a dispute with a civilian; and (8) Defendant's failure to promote Flanagan to Deputy Chief sometime in 2011. Flanagan alleges that all eight of these instances are also examples of retaliation in addition to two other instances:[8] (9) Loizon publicly complaining about lawsuits filed against Defendant in May 2008 and (10) Defendant stamping Flanagan's time sheet in May 2012. What follows is the court's attempt to corral all of these events together in some coherent manner, a feat which escaped both Flanagan and Defendant in their respective briefs and statements of facts.

### A. Confrontation with Loizon

---

[7] The court only includes those allegations that are supported by admissible evidence, as detailed in the introduction.

[8] *See infra* note 7.

On May 14, 2008, Flanagan was approved for two hours of FMLA[9] leave to care for her uncle who was dying from brain cancer.  [Pl. SOF ¶ 24, ECF No. 122.]  As a result, Flanagan arrived to work approximately 2 hours after her 6:00 p.m. shift started.  [Def. SOF ¶ 43, ECF No. 99.]  As Flanagan was exiting her car in the parking lot to walk into the facility, she was confronted by Loizon, who questioned Flanagan on why she was late for her shift.  By the time Flanagan arrived at the facility, she should have already been in the field checking on her probationers.  As a Deputy Chief, Loizon was within his right to question Flanagan on why she was late to work.  [*Id.* ¶ 45.]  However, at the of the encounter, Loizon was unaware that Flanagan had been granted 2 hours of FMLA leave. Nevertheless, the confrontation between Loizon and Flanagan escalated.  According to Flanagan, the following exchange took place:

> **Loizon:**    What the fuck are you doing at this location at this time of the night?
> **Flanagan:** You're not talking to me.
> **Loizon:**    I am talking to you.
> **Flanagan:** No. You not talking to me. You need to get away from me.
> **Loizon:**    I'm so sick of your shit.  You just don't know what I could do to you.
> **Flanagan:** You can't do anything to me.
> **Loizon:**    I could do whatever I want to you.  I could hit you and nobody would give a fuck.

[*Id.* Tab A (Flanagan), 178:20-22, 179:2-14, 183:11-14.]  According to Flanagan, Loizon then yelled at Flanagan's partner, who was present for the encounter.  Flanagan threatened to, and ultimately did, call the Chicago Police Department. [*Id.* ¶ 51.]

Flanagan testified that, shortly after this parking lot incident, Loizon was "walking around [the office] screaming and hollering constantly 'I'm so sick of everybody. These fucking lawsuits.'"  [Def. SOF ¶ 73, ECF No. 99.]  However, Flanagan admitted that the statement was not directed toward her, that there were lawsuits brought by other employees in APD, and that

---

[9] Family and Medical Leave Act, 29 U.S.C. 2601, *et seq.*

she did know specifically which lawsuit Loizon was yelling about.  [*Id.* ¶ 75.]  In addition, Flanagan admitted that Loizon made the statement regarding lawsuits only once.  [*Id.* ¶ 74.]

### B.  Investigation of Confrontation with Loizon

Flanagan also alleges that APD failed properly to investigate the May 2008 incident. Vaughan and Noreen Larson, Assistant Director of APD Human Resources, recommended to then Acting Chief Probation Officer Jesus Reyes that the investigation should be handled by a person outside of APD to avoid the perception of a conflict in interest. [Def. SOF ¶ 59, ECF No. 99.]  The investigation was referred to the OCJ Human Resources Administrator Bruce Wisnieski ("Wisnieski").  [*Id.*]  OCJ also assigned its Labor Counsel Keith Sevcik ("Sevcik") and Attorney Colleen Glass ("Glass") to investigate Flanagan's complaints.  [*Id.* ¶ 60.]  As part of his investigation, Sevcik spoke with Loizon, Flanagan, and a number of Flanagan's co-workers.  However, Sevcik turned the investigation over to Wisnieski for reassignment after Flanagan's attorney accused Sevcik of being biased and demanded that the investigation be done by someone else.  [*Id.* ¶ 65.]  Glass ultimately closed the investigation after she attempted to meet with Flanagan for an interview but was unable to do so.  [*Id.* ¶ 66.]

In addition to conducting its own investigation, OCJ retained attorney Stuart Garbutt of the law firm of Meckler Bulger Tilson Marick & Pearsno to investigate the incident involving Loizon and Flanagan.  [Def. SOF ¶ 67, ECF No. 99.]  The investigation conducted by Garbutt concluded that OCJ properly handled and responded to the incident.  [*Id.*]  Flanagan claims that she was aware of two other probation officers, Wendy Jocelyn ("Jocelyn") and Judy Sole ("Sole"), who reported incidents of harassment and had the harassing individual either moved from the facility or moved to a different shift.  [Pl. SOF ¶ 34, ECF No. 122.]  However, Flanagan admitted that her knowledge regarding Sole's complaint was based on rumors, that she did not

actually know that the person Sole complained about was moved, and that she did not know who

Sole made the complaint to or what kind of altercation Sole complained about.  [Def. SOF, Tab

A (Flanagan) 170:13-172:19.)  Similarly, Flanagan admitted that her knowledge of Jocelyn's

complaint was based solely on statements from Jocelyn's former supervisor.  Flanagan also

could not articulate the basis of her knowledge of Jocelyn's complaint or who Jocelyn reported

to.  [Def. SOF, Tab A (Flanagan), 174:14-3, ECF No. 99.]  Following the investigation, Matthew

Sobieski ("Sobieski") replaced Loizon as Deputy Chief of the Home Confinement Unit on July

7, 2008, and Loizon was transferred out of the unit.  [*Id.* ¶ 68.]

### C.  6:00 a.m. to 2 p.m. Shift

Approximately one year later, in April 2009, APD and AFSCME Local No. 3486, the

labor union for probation officers, began to discuss the possibility of adding additional morning

shifts of 6:00 a.m. to 2:00 p.m. and 11:00 a.m. to 7:00 p.m.  [Def. SOF ¶ 77, ECF No. 99.]  At

the time, Flanagan's shift was 6:00 p.m. to 2:00 a.m., and she expressed her desire to OCJ to

switch to one of the available 6:00 a.m. to 2:00 p.m. shifts.  [*Id.* ¶ 78.]  However, Flanagan was

informed that two other probation officers, Ron Pula ("Pula"), who is white, and Fred Gilbert

("Gilbert"), who is black, were offered the available 6:00 a.m. to 2:00 p.m. shifts.  Shifts within

the Home Confinement Unit are assigned based on unit seniority, which is the date that the

probation officer was last transferred to the Home Confinement Unit and based on continuous

service within the Unit.  The transfer procedure is set forth in the Collective Bargaining

Agreement.  [*Id.* ¶ 89.]

According to Defendant, Pula and Gilbert received the 6:00 a.m. to 2:00 p.m. shift

assignment because they both had greater Unit seniority than Flanagan because they had worked,

continuously, in the Home Confinement Unit longer than Flanagan.  [Def. SOF ¶ 90, ECF No.

99.]  Flanagan, of course, argues that she had greater seniority than Pula and Gilbert because they transferred to another unit and, therefore, lost their seniority.  Defendant responds by stating that Gilbert and Pula never transferred out of the Home Confinement Unit.  Rather, Gilbert and Pula were temporarily assigned to other units due to staff shortages.  Temporary assignments are not considered "official transfers" so as to change seniority within the Home Confinement Unit.  [*Id.* ¶ 90.]  Flanagan ultimately "allowed" Pula and Gilbert to take the 6:00 a.m. to 2:00 p.m. shift and put in an official request for one of the 11:00 a.m. to 7:00 p.m. shifts on April 14, 2009.  [*Id.* ¶ 82.]  Flanagan was offered the 11:00 a.m. to 7:00 p.m. shift in July 2009, and she took it.

### D.  Red-Light Ticket

On October 6, 2009, APD received a red-light ticket for $100 from the City of Chicago Department of Revenue for an incident that occurred on August 12, 2009.  [Def. SOF ¶ 98, ECF No. 99.]  APD determined that Flanagan and another probation officer named Devin Daniel ("Daniel") were operating the car in question at the time the violation occurred.  [*Id.*]  Pursuant to APD policy, Flanagan and Daniel were responsible for paying the fine or providing documentation for review in order to contest the violation.  [*Id.* ¶ 99.]  On October 8, 2009, APD received a request for administrative release from Flanagan requesting to be relieved from having to pay the ticket.  [*Id.* ¶ 100.]  APD forwarded the request to the City of Chicago for its review.

On November 2, 2009, APD received a letter from the City of Chicago stating that Flanagan's request for administrative relief was denied based on video of the red-light violation.  APD so notified Flanagan on November 5, 2009.  As a result, Flanagan was responsible for paying the $100 fine.  [Def. SOF ¶ 102, ECF No. 99.]  Sometime after APD informed Flanagan that her request for administrative relief was denied, an additional $100 late fee penalty was

added to the outstanding $100 red-light ticket. [*Id.* ¶ 103.] The late fee penalty was ultimately waived, and Flanagan had to pay only the $100 ticket. [*Id.*] Flanagan claims that five other probation officers—Sobieski, Dmitri Joe, Marty Jan, Mike Bailey, and Loizon—were able to appeal and not pay their respective tickets. [*Id.* ¶ 105.] However, Flanagan admits that she has no knowledge regarding whether these officers received notice of their tickets, what kind of tickets they received, or when they were given the opportunity to appeal the ticket. [*Id.*] In fact, Flanagan admits that her knowledge regarding these individuals' tickets is based on "office discussions" with an unidentified person. [*Id.*]

### E. May 26, 2010 Parking Lot Incident

In 2010, APD planned on replacing some of its old vehicles with new ones. Part of that plan involved removing old vehicles from APD's Ashland parking lot. [Def. SOF ¶ 109, ECF No. 99.] On February 14, 2010, then-Assistant Chief Probation Officer Lavone Haywood ("Haywood") informed all employees in the Walnut facility of APD where Flanagan was stationed that no staff member would be allowed to park in the Ashland parking lot in order to prevent private vehicle damage during removal of old APD vehicles. [*Id.* ¶ 110.]

On May 25, 2010, Loizon observed two personal vehicles in the Ashland parking lot, but did not know to whom the vehicles belonged. Loizon directed Supervisor Archie Shaw ("Shaw") to find out who owned the vehicles and to inform them to remove them from the lot. Failure to remove their vehicles could result in being written up or having their cars towed. Shaw discovered that the cars belonged to Flanagan and probation officer Michael Wilkens, and he informed them, on May 26, 2010, to remove their cars. Despite not getting towed or written up, Flanagan called the Chicago Police Department to complain after she was told that she could not park in the Ashland parking lot. [Def. SOF ¶ 116, ECF No. 99.] Flanagan claims that she

observed a number of cars in the Ashland parking lot, in addition to her car and Wilkens' car, that she believed belonged to Pula, a white co-worker. [Pl. SOF ¶ 47, ECF No. 122.] However, Flanagan admitted that she saw a number of other cars in the Ashland parking lot, besides Pula's vehicle, and that she did not know to whom they belonged. [Def. SOF, Tab A (Flanagan), 296:23-297:12.]

### F. Promotion to Deputy Chief

Flanagan claims that, sometime in 2009, she expressed to Donna Vaughan that she was interested in applying for a promotion to an open position for Deputy Chief in APD. According to Flanagan, Vaughan advised her that she would not be allowed to apply and "refused to give [her] an application." [Pl. SOF, Ex. 2 at ¶ 3, ECF No. 122.] The Deputy Chief position remained open for two years until it was filled by Matt Sobieski in May 2011. Flanagan argues that she was more qualified than Sobieski, who is white, because she has a Master's Degree in Criminal Justice. [Pl. SOF ¶ 61, ECF No. 122.] However, prior to being promoted to Deputy Chief, Sobieski was a Supervisor with APD for 14 years. In comparison, Flanagan was never a supervisor and was employed by APD for only 8 years at the time that she expressed interest in Deputy Chief position. In fact, it is undisputed that it is extremely uncommon, if not unprecedented, for a probation officer to skip over the position of Supervisor and be promoted directly to Deputy Chief. [Def. Resp. to PL. SOF, Tab Y (Sobieski) at ¶ 6; Tab X (Loizon) at ¶ 8; Tab Z (Larson) at ¶ 5.) Additionally, when a position becomes available at APD, the position is posted and everyone has a chance to apply. Flanagan admits that she never applied for the position of Deputy Chief. The reason she never applied for the position appears to be that she could not obtain Chief Managing Officer ("CMO") status, a prerequisite for applying for the position of Deputy Chief. In order to obtain CMO status, an individual needs supervisory

experience for a number of years, as required by the State of Illinois. Application to obtain CMO status is available through the Administrative Office of the Illinois Courts, an agency independent from APD. It is unclear whether Flanagan ever sought CMO status, but it is undisputed that she had no supervisory experience with APD.

### G. Joseph Gibrick Incident

On June 18, 2011, Flanagan was driving on I-290 while conducting field work. [Def SOF ¶ 121, ECF No. 99.] Just as Flanagan was exiting I-290 onto First Avenue, a car driven by civilian Joseph Gibrick ("Gibrick") cut off Flanagan's vehicle. [*Id.*] Shortly thereafter, when the two vehicles were stopped at a red light, Gibrick started taking photos of Flanagan's county vehicle. [*Id.* ¶ 122.] Flanagan called dispatch to send the local police authority to "detain" Gibrick. [*Id.* ¶ 123; Pl. SOF ¶ 49, ECF No. 122.] As a result, Gibrick filed a complaint with APD regarding Flanagan's conduct and argued that Flanagan and her partner, Mike Wilkens, wrongfully caused his detention. [Def. SOF ¶ 124, ECF No. 124.] APD policy requires officers to limit themselves to the duties of probation while in the field and does not permit officers to take any action other than contacting the dispatcher concerning any violation of traffic laws or ordinances. [*Id.* ¶ 125.] An investigation by Sobieski revealed that Flanagan and her partner exercised poor judgment in their response to the Gibrick situation. As a result, Flanagan and her partner received a "coach and counseling memorandum" on December 14, 2011. [*Id.* ¶ 127.] According to the collective bargaining agreement, assignment of a coach and counseling are not forms of discipline. [*Id.* ¶ 128.]

### H. Hepatitis C Incident

Flanagan claims that Defendant intentionally exposed her to Hepatatis C when, on May 1, 2012, Flanagan went to the residence of a probationer named Michael Liska ("Liska") with

her partner Anthony Rogers ("Rogers"). Flanagan and Rogers visited Liska so that Rogers could place a GPS device on Liska's ankle. [Def. SOF ¶ 134, ECF No. 99.] Shortly after the visit, Liska lodged a complaint against Flanagan and Rogers stating that Flanagan and Rogers conducted their business with Liska on his porch rather than entering his home, which embarrassed him in front of his neighbors. [*Id* ¶ 135.] Liska also complained that the officers did not respond to him after he informed them that the GPS device was too tight. [*Id.*]

In response to Liska's complaints, Sobieski had an investigatory meeting with Flanagan, and Flanagan claimed that Liska had Hepatitis C. Flanagan filed a grievance against APD for her alleged exposure to the disease. It is unclear from the record whether Liska actually had Hepatitis C or whether Defendant knew that Liska had Hepatitis C prior to Flanagan's visit on May 1, 2012. What is clear, however, is that Flanagan was not infected with Hepatitis C as a result of her interaction with Liska. Defendant argues that APD policy states that staff may not relinquish their duties or responsibilities based on any illnesses that may afflict their probationers, so even if Flanagan had known about the alleged disease, she would still have been expected to carry out her duties. Finally, eight other officers grieved about exposure to communicable diseases, and Flanagan has no knowledge regarding whether any of those officers were treated better than or differently from Flanagan.

## I. Timesheet Incident

Flanagan claims that, in the spring of 2012, three supervisors who were not in her unit—Robert Sepulveda ("Sepulveda"), Candace Haskins ("Haskins"), and Vernon Winstead ("Winstead")—began following her and "monitoring her whereabouts." [Pl. SOF ¶ 56, ECF No. 56.] Flanagan cannot recall ever being followed by Sepulveda, Haskins, or Winstead. Rather, Flanagan's knowledge of being "monitored" by the trio is based on a conversation she overheard

where Sepulveda, Haskins, Winstead and Loizon discussed following Flanagan around. [Pl. SOF ¶ 58, ECF No. 122.] The only incident that Flanagan could recall where her actions or whereabouts were scrutinized occurred on May 24, 2012 when she discovered that her timesheet had been time-stamped, unusual because no one else's timesheets were time-stamped. [Def. SOF ¶ 142, ECF No. 99.] Flanagan complained about Sepulveda, Haskins, Winstead, and the time-sheet incident to Assistant Chief Probation Officer Haywood, who ordered Sepulveda, Haskins, and Winstead to refrain from having any further contact with Flanagan. [*Id.* ¶ 144.] No formal complaints were filed.

### J. EEOC Charges

As a result of these events, Flanagan filed three separate EEOC charges: April 1, 2008; September 8, 2011; and May 16, 2012. The April 1, 2008 EEOC charge alleges retaliation by her employer, OCJ, based on the lawsuit she filed in 2006. [SAC, Ex. B, ECF No. 17.] The EEOC charge states that "[d]uring my employment, I…was subjected to intimidation and different terms and conditions of employment."[10] [*Id.*] The September 8, 2011 EEOC charge alleges discrimination by her employer based on Flanagan's race, black, and that she was "subjected to different terms and conditions of [her] employment than [her] non-Black co-workers, including, but not limited to, having [her] work scrutinized." [*Id.*, Ex. A.] Finally, the May 16, 2012 EEOC charge alleges retaliation by the OCJ for complaining about discrimination, for which she was "disciplined on or about December 14, 2011." [*Id.* Ex. C.] Figuring out which EEOC charge corresponds to which events is a Herculean task (and requires guesswork) that the court cannot undertake. As explained below, it is also a futile task. Flanagan has failed to demonstrate that she has a claim either for race discrimination or retaliation.

---

[10] The EEOC charge also claimed discrimination based on sex. However, Flanagan's complaint does not allege discrimination based on sex, and the court does not address that claim.

# III.    STANDARD

Rule 56 allows a movant to seek summary judgment when the opposing party's case consists of factually unsupported claims. *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Simply put, "summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (quotations omitted).

In order to survive a Rule 56 motion, the nonmoving party must either: (a) show that the movant cannot produce admissible evidence that a fact is not disputed, (b) show that the materials cited by the movant do not establish the absence of a genuinely disputed material fact, or (c) direct the court's attention to specific admissible evidence in "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that show that there is some genuinely disputed material fact. Fed. R. Civ. P. 56(c)(1); *see United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510–11 (7th Cir. 2010) ("[S]ummary judgment may only be defeated by pointing to admissible evidence in the summary judgment record that creates a genuine issue of material fact."). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive a summary judgment motion; there must be evidence on which the jury

could reasonably find in favor of the nonmoving party." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In addition, "[D]istrict courts presiding over summary judgment proceedings may not weigh conflicting evidence or make credibility determinations, both of which are the province of the jury." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (internal quotations and citations omitted); *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir.2003) ("As we have said many times, summary judgment cannot be used to resolve swearing contests between litigants.") Furthermore, at the summary judgment stage, "the court views the record in the light most favorable to the non-moving party, and draws all reasonable inferences in that party's favor." *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255, and *Antonetti v. Abbott Labs.*, 563 F.3d 587, 591 (7th Cir. 2009)).

### III.     ANALYSIS

#### A.  Title VII Race Discrimination Claim

Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).  Under Title VII, Flanagan is required to exhaust her administrative remedies by filing a complaint with the appropriate federal agency or state agency.  *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 270 (7th Cir. 2004).  Flanagan has 300 days from the alleged discrimination action to file a complaint with the appropriate state agency.  42 U.S.C. § 2000e-5(e)(1).  The court will review solely those charges "included in [the] EEOC charge,…or reasonably related to the allegations of the charge and growing out of such allegations." *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 689 (7th Cir. 2001).  Generally, the court may

consider evidence only from the 300-day period.  *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d

340, 344 (7th Cir. 1999).  However, as the statute of limitations is not jurisdictional in nature, it

is subject to equitable considerations. *Volvosek*, 344 F.3d at 687.

For example, if a plaintiff alleges "continuing violations," which constitute a pattern and

practice of discrimination, the court may look outside the relevant time period.  *Hardin*, 167 F.3d

at 344.  Although Flanagan's race discrimination claim is brought only pursuant to Title VII, this

doctrine applies to her § 1981 retaliation claims as well.  The Supreme Court has explained the

continuing violation doctrine as "preclud[ing] recovery for discrete acts of discrimination or

retaliation that occur outside the statutory time period," but permitting "consideration of the

entire scope of a hostile work environment claim, including behavior alleged outside of the

statutory time period,…for the purpose of assessing liability, so long as an act contributing to

that hostile environment takes place within the statutory time period." *Nat'l R.R. Passenger

Corp. v. Morgan*, U.S. 101, 105 (2002).

Flanagan filed her race discrimination EEOC charge on September 8, 2011.  In that

EEOC charge, Flanagan alleged that she was "subjected to different terms and conditions of

employment than [her] non-Black co-workers, including, but not limited to, having [her] work

scrutinized."  Although not explicit in the EEOC charge itself (or her Second Amended

Complaint, for that matter), Flanagan makes the argument in her response to Defendant's motion

for summary judgment that the allegations in her EEOC charge give rise to a claim for hostile

work environment based on racial discrimination.  Although inartfully pled, Flanagan's EEOC

adequately alleges a claim for hostile work environment based on racial discrimination,

especially in light of the fact that Flanagan notes that she has been subjected to different terms

and conditions of employment "during her tenure" with her employer.  *Brindley v. Target Corp.*,

761 F.Supp.2d 801, 807 (N.D. Ill. 2011) ("[I]t is noteworthy that there is no separate box on the EEOC form for hostile work environment claims (contrast the separate box provided for retaliation claims). It would surely be reasonable (and indeed logical) for a lay plaintiff to check the general discrimination box when seeking to advance a hostile work environment claim.")

Because Flanagan brings her race discrimination claim pursuant to Title VII, at least one of the instances of discrimination she alleges must fall within 300 days of the September 8, 2011 EEOC charge. Only one event satisfies that requirement. In May 2011, Flanagan claims that she was discriminated against based on her race because she was not promoted to Deputy Chief. Instead, Matt Sobieski, a white male, was promoted to Deputy Chief. The event date listed in the EEOC charge is consistent. The court may take note of the other instances of discrimination that Flanagan has alleged in considering the entire scope of the allegedly discriminatory hostile work environment.

To survive summary judgment on a hostile work environment claim against an employer, the employee must show: "(1) [she] was subject to unwelcome harassment; (2) the harassment was based on [her] race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability." *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1029 (7th Cir. 2004); *see also Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000). In evaluating the severity and pervasiveness of the conduct, the court examines "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employees work performance." *Russell v. Bd. of Trustees of Univ. of Ill. at Chicago*, 243 F.3d 336, 343 (7th Cir. 2001) (internal citations omitted). Ultimately, to satisfy the

"severe or pervasive" prong, Flanagan must show that her work environment was both subjectively and objectively offensive. *Robinson v. Sappington*, 351 F.3d 317, 329 (7th Cir. 2003). In other words, the environment must be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002).

As an initial matter, Flanagan alleges eight[11] separate instances of discriminatory conduct that, taken together, are alleged to constitute a hostile work environment. Those instances include: Flanagan's parking lot confrontation with Loizon on May 14, 2008; Defendants' failure to investigate the May 14, 2008 incident; Flanagan's failure to secure to the 6 a.m. to 2 p.m. shift in April 2009; Flanagan's receipt of a red-light ticket in October 2009; Flanagan's inability to park in a certain parking lot in May 2010; Flanagan's confrontation with a citizen that resulted in the assignment of a coach in December 2011; Defendant's failure to promote Flanagan to Deputy Chief in June 2011, and Defendant's intentional exposure of Flanagan to Hepatitis C in May 2012. In reviewing the facts presently before the court, a reasonable jury could not conclude that these incidents are evidence of a racially discriminatory hostile work environment. Flanagan has not presented any evidence that any of the incidents, either on their own in or their totality, occurred because of her race. Flanagan puts forward no evidence that Loizon's confrontational gestures toward her on May 14, 2008 were racially motivated. Similarly, Flanagan has failed to point to any admissible evidence that the Defendant's alleged failure to investigate was based on Flanagan's race. Although Flanagan makes a cursory argument that other probation officers who are white were treated more favorably, Flanagan has no personal knowledge regarding those

---

[11] Flanagan alleges more than seven separate instances of discriminatory conduct, but the court has already ruled that several of them are not supported by competent evidence.

other officers' alleged complaints or the APD's response to those complaints.  Simply put, Flanagan has no basis for comparison.

Moreover, Flanagan's failure to secure the 6 a.m. to 2 p.m. shift cannot be said to have been racially motivated as it is undisputed that both selected individuals (one of whom was black) had more seniority than Flanagan.  Flanagan's claim that her receipt of a red-light ticket was racially motivated similarly fails.  Flanagan admits she lacks any first-hand knowledge regarding the circumstances surrounding the individuals she cites as comparators who allegedly did not have to pay their tickets.  Flanagan's claim that her inability to park in the Ashland parking lot was due, at least in part, to her race is also meritless.  Flanagan admits that other probation officers were ordered not to park their personal vehicles in the Ashland parking lot and offers no evidence that would rebut the APD's legitimate reason for ordering probation officers to refrain from parking there.  Although Flanagan claims that she saw vehicles parked in the Ashland lot at the same time that she was told she could not park there, she has no knowledge regarding to whom those vehicles belonged.  Therefore, she cannot argue that she was treated less favorably than non-black probation officers, as she has no factual basis for that argument.

Further, Flanagan's claim that the assignment of a coach and counsel in December 2011 following an altercation with a civilian was racially motivated is baseless.  To support her claim that the action taken by her employer was due to race discrimination, Flanagan simply says another officer was "protected" and she was "not protected."  The court cannot guess what she means by this.  Further, Flanagan fails to identify the race of the other officer and fails to explain whether or how the other officer was treated more favorably.  Finally, as explained in more detail below, Flanagan fails to present any evidence that Defendant's failure to promote Flanagan to

Deputy Chief in June 2011 was racially motivated, nor that the Hepatitis C incident was racially motivated.

In addition to alleging a hostile work environment due to race discrimination, Flanagan alleges that her employer committed three discrete acts of race discrimination. Flanagan alleges that Loizon's vulgarities toward her in May 2008, Defendant's failure to assign Flanagan to the 6 a.m. to 2 p.m. shift in April 2008, and Defendant's failure to promote Flanagan to Deputy Chief in 2011 are all discrete acts of race discrimination. A discrete retaliatory or discriminatory act "occurred" on the day that it "happened." *National R.R.*, 536 U.S. at 109. A party, therefore, must file a charge within 300 days of the date of the act or lose the ability to recover for it.

As noted, the only EEOC charge alleging race discrimination was filed on September 8, 2011. Therefore, Flanagan's claim that she was not promoted to Deputy Chief is the only claim that can be examined. Discrimination may be established in either of two ways—through direct evidence of discriminatory motive or intent or through the indirect burden-shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Simmons v. Chi. Bd. of Educ.*, 289 F.3d 488, 492 (7th Cir. 2002). Here, Flanagan does not present any direct evidence that Defendant failed to promote her to Deputy Chief based on her race. Therefore, she must proceed on the indirect, burden-shifting method set out in *McDonnell Douglas*. A plaintiff successfully establishes a *prima facie* case of discrimination by the indirect method if she shows that: (1) she is a member of a protected class; (2) she is qualified for the position; (3) she was rejected for the position; (4) the position was given to someone outside the protected class who was similarly or less qualified than she. *Jackson v. City of Chi.*, 552 F.3d 619, 622 (7th Cir. 2009). The presumption of discrimination created by establishing a *prima facie* case shifts the burden to the defendant "to produce a legitimate

noninvidious reason for its actions." *Atanus v. Perry*, 520 F.3d 662, 672 (7th Cir. 2008). If the defendant rebuts the *prima facie* case, the burden then shifts back to the plaintiff to show that the reasons proffered by the defendant are merely pretextual. *Id.*

Here, the court need not determine whether Defendants produced a legitimate reason for its actions as Flanagan has failed to establish the second, third, or fourth prongs of the *Jackson* test. Flanagan's only evidence that she was qualified for the position of Deputy Chief is her own assertion that she has a Master's Degree in Criminal Justice. Defendant is correct in stating that Flanagan has not presented any evidence that a Master's Degree in Criminal Justice satisfies the requirements for the position of Deputy Chief. In fact, Flanagan fails to establish that she has *any* knowledge regarding how individuals are selected as Deputy Chief or what qualifications are required for the position. It is undisputed that achieving Chief Managing Officer ("CMO") status is a prerequisite for the Deputy Chief position. CMO status is granted based on an individual's supervisory experience, of which Flanagan has none. In fact, the record demonstrates that no probation officer (Flanagan's position) has ever been promoted to Deputy Chief without supervisory experience. Additionally, Matt Sobieski, who was hired as Deputy Chief in June 2011, was more qualified than Flanagan. In contrast to Flanagan's lack of supervisory experience, Sobieski had been a supervisor in the APD for 14 years.

Flanagan's argument that she was discriminated against based on her race, either through a hostile work environment or through the discrete act of not being promoted to Deputy Chief has no basis in fact. Therefore, summary judgment is granted on Flanagan's claim for race discrimination.

**B. Title VII and § 1981 Retaliation Claims**

Title VII protects employees from retaliation as a result of their complaints regarding discrimination or other unlawful employment practices of their employer. 42 U.S.C. § 2000e-3(a). A plaintiff may also bring a retaliation claim under § 1981. *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012). Methods of proof and substantive standards that apply to Title VII retaliation claims also apply to § 1981 claims.[12] *Smith*, 681 F.3d at 896; *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). Under both statutes, a plaintiff may establish a retaliation claim through either the direct or indirect methods of proof. *Smith*, 681 F.3d at 896. Under the direct method, Flanagan must show that (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action taken by her employer; (3) and there was a causal connection between the two. *Humphries v. CBOCS West, Inc.*, 474 F. 3d 387, 404 (7th Cir. 2007). Under the indirect method, Flanagan must show that after opposing the employer's discriminatory practice only she, and not any similarly situated employee who did not complain of discrimination, was subjected to a materially adverse action even though she was performing her job in a satisfactory manner. *See Sylvester v. SOS Children's Villages Ill., Inc.*, 453 F.3d 900, 902 (7th Cir. 2006). Thus, the indirect "method of establishing a *prima facie* case requires proof both of similarly situated employees and of the plaintiff's performing his job satisfactorily." *Sylvester*, 453 F.3d at 902.

Like her race discrimination claims, Flanagan's retaliation claims fall into two separate categories: (1) discrete acts of retaliation, and (2) hostile work environment in retaliation for Flanagan's protected activity. The discrete acts of retaliation alleged by Flanagan are the same discrete acts that she alleged were examples of race discrimination: (1) Loizon's vulgarities toward Flanagan in May 2008; (2) Defendant's failure to assign Flanagan to the 6:00 a.m. to 2:00

---

[12] Because Flanagan filed parallel Title VII and § 1981 retaliation claims, the court need not attempt to figure out which claims fit into which EEOC charge since § 1981 retaliation claims do not require that plaintiff first file an EEOC charge.

p.m. shift; and (3) Defendant's failure to promote Flanagan to Deputy Chief. The discrete acts of retaliation are analyzed under the standard methods of proof, i.e., direct or indirect method.

Addressing the May 14, 2008 incident involving Loizon and Flanagan, Flanagan's claim fails under both the direct and indirect method. First, the indirect method is inapplicable as Flanagan cites no similarly situated employee. The direct method also fails because, although unprofessional, Loizon's threat cannot be said to be a materially adverse action. Adverse actions taken in retaliation are construed broadly. *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996), *see also Knox v. State of Ind.*, 93 F.3d 1327, 1334 (7th Cir. 1996) (describing retaliatory adverse actions as that which "put the complainant in a more unfriendly working environment: actions like moving the person from a spacious, brightly lit office to a dingy closet, depriving the person of previously available support services (like secretarial help or a desktop computer), or cutting off challenging assignments.") However, "not everything that makes an employee unhappy is an actionable adverse action." *Smart*, 89 F.3d at 441. There is nothing in the record that indicates Loizon had any intent to or did in fact act on his words. *Smith v. Northeastern Illinois University*, 388 F.3d 559, 568 (7th Cir. 2004) ("On this record, therefore, we construe the statement as more of an empty threat than a seriously contemplated declaration of an intent to do harm."), *see also Walker v. Mueller Industries*, 408 F.3d 328, 333 (7th Cir. 2005) (Co-workers threatening to harm plaintiff was "too tepid to constitute actionable harassment.") Loizon's conduct, while inappropriate, does not constitute an adverse action.

Next, Flanagan argues that she has an independently actionable claim for retaliation regarding Defendants' failure to assign her to the 6:00 a.m. to 2:00 p.m. shift. First, Flanagan's inability to work her desired shift is likely not an adverse action. *Peters*, 512 Fed. Appx. at 626 ("Wal–Mart's refusal to allow Peters to change shifts is not unlawful because schedule

assignments generally are not adverse employment actions."). But, more importantly, to the extent that Defendant treated Flanagan differently than Gilbert and Pula, Flanagan offers no evidence that the difference in treatment was motivated by retaliation. The undisputed evidence shows that Defendants' decision to place Gilbert and Pula in the 6:00 a.m. to 2:00 p.m. was based on the fact that both Gilbert and Pula had seniority over Flanagan. Either under the direct or indirect method, Flanagan's claim fails.

Finally, Flanagan has failed to demonstrate that Defendant's failure to promote Flanagan to Deputy Chief was discriminatory. As noted above, it is undisputed that Sobieski was more qualified for the position of Deputy Chief than Flanagan. The position required applicants to have supervisory experience, which Flanagan did not possess.

Flanagan's hostile work environment claim is similarly unavailing. Retaliatory harassment can rise to the level of a hostile work environment "if it is severe enough to cause a significant change in the plaintiff's employment status." *Stutler v. Ill. Dep't of Corrs.*, 263 F.3d 698, 703 (7th Cir. 2001). Here, the facts do not rise to the level of the severe or pervasive threshold. *Walker*, 408 F.3d at 333-34. On balance, the events that Flanagan points to are isolated, if unsupported, incidents, none of which is serious enough to create an abusive environment that altered Flanagan's employment. *Smith*, 386 F.3d at 568, *see also Adusumilli v. City of Chicago*, 164 F.3 353, 361 (7th Cir. 1998) (stating "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment" (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1999))). The fact that Flanagan has alleged many incidents does not make her retaliation claims any more viable. Aside from the rampant evidentiary issues that plague her claims, the only incident arguably severe enough to

meet the retaliation standard is Loizon's parking lot confrontation with Flanagan. However, this incident was too isolated to meet the pervasiveness standard.

The other incidents cited by Flanagan—the failure to investigate the May 2008 incident with Loizon; not securing the 6:00 a.m. to 2:00 p.m. shift; the red-light ticket incident; the May 2010 parking lot incident; the Gibrick incident; the Hepatitis C incident; and the May 2012 timestamp incident—lack sufficient proof that they occurred in the manner alleged by Flanagan. The court's review of the record reveals that APD made a good faith effort to investigate Flanagan's confrontation with Loizon in May 2008. The investigation actually led to Loizon's transfer out of the Home Confinement Unit. The record also demonstrates that Flanagan's failure to secure the 6:00 a.m. to 2:00 p.m. work shift was due to her lack of seniority in comparison to the two individuals who did secure the shift. There is also no evidence in the record to suggest that Flanagan's assignment of a coach and counseling memorandum following the incident with Mr. Gibrick was significant enough in its effect on her to contribute to a hostile work environment. Nor is there any evidence to suggest that the assignment of a coach and counseling memorandum was motivated by retaliation. The same can be said for both the time-stamp incident and the Hepatitis C incident. These incidents, taken together, cannot constitute a hostile work environment. *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993) ("[R]elatively isolated instances of non-severe misconduct will not support a hostile work environment claim." (internal quotation marks omitted). Therefore, summary judgment on Flanagan's retaliation claims is granted.

## IV. CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment [97] is granted. Defendant's motion to strike [129] is denied as moot.

Date:   March 28, 2016                                      _____/s/_____
                                                            Joan B. Gottschall
                                                            United States District Judge